560 A.2d 32

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY**

v.

**MARYLAND MARINE MANUFACTURING CO., INC.**

No. 89, Sept. Term, 1988.

Court of Appeals of Maryland.

July 6, 1989.

492

Peter Max Zimmerman, Deputy People's Counsel (Phyllis Cole Friedman, People's Counsel for Baltimore County, both on brief), Towson, for appellant.

John O. Hennegan (Romadka, Gontrum & Hennegan, both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case involves the right of riparian owners to construct improvements from their land into the tidal waters of the State, and the zoning power of counties in relation to these improvements. Specifically, the question presented is whether current Baltimore County Zoning Regulations (BCZR) are applicable to a riparian owner's proposed construction of a "floating" restaurant on a pier extending 125 feet from the shoreline into the water in front of the owner's property.[1]

## I.

Maryland Marine Manufacturing Company, Inc. (Maryland Marine) owns a parcel of land bordering on the east

---

1. A riparian owner is generally defined as one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water, such as a river, bay, or running stream. *See, e.g., Owen v. Hubbard,* 260 Md. 146, 271 A.2d 672 (1970); *B. & O. R.R. v. Chase,* 43 Md. 23 (1875).

side of Frog Mortar Creek in Baltimore County, a tributary of the Middle River which flows into the Chesapeake Bay. It currently operates a marina on the property under a special exception to the existing D.R. 5.5. (Density Residential—5.5 dwelling units per acre) zoning. In 1984, .64 acres of the property was rezoned from D.R. 5.5 to B.L. (Business Local). This classification covers a number of permitted uses, including restaurants.

On January 16, 1987, Maryland Marine petitioned the Zoning Commissioner for a determination of the legality of its proposed plan to build a restaurant on top of piers and pilings over the tidal waters of Frog Mortar Creek. The question before the Zoning Commissioner was whether

"zoning lines on land extend and comprehend tide water rivers, lakes and running streams or land under water and improvements proposed or erected thereon and apply to riparian owners; further to determine whether or not the Baltimore County Zoning Regulations apply to riparian rights and to improvements erected on tidal waters or land under water."

Maryland Marine argued that § 417 of the BCZR provides for the extension of existing zoning lines on land into tidal water rivers, lakes and running streams. It pointed out that § 417, entitled "Waterfront Construction," provides in § 417.1 that

"[all] waterfront construction, such as piers, wharves, docks, bulkheads, or other work extended into navigable waters beyond mean low tide ... shall be governed by these regulations as well as the Baltimore County Code...."

Maryland Marine also referred to § 417.3 which provides:

"For the purpose of defining boundaries within which waterfront construction may take place, divisional lines shall be established in accordance with the following rules:

(a) With straight shore lines: If the shoreline is straight, the divisional lines are to be extended from the

intersection of the property line and the shoreline into the water perpendicular to the shoreline, or where the property lines are parallel and it is practical to do so, the proper boundary line shall be extended in a straight line into the water.

(b) With irregular shorelines: Where the shoreline is not straight, draw a baseline between the two corners of each lot at mean low water line. Then draw a line from the corner of each proprietor's property into the water at right angles with the base line. If by reason of the curvature of the shore, the lines, when projected into the water, diverge from each other, the area excluded by both lines shall be equally divided between the two adjoining proprietors."

It was Maryland Marine's contention that the existing B.L. zoning of its .64 acres extended into the waters of Frog Mortar Creek, thereby allowing construction of its proposed restaurant as a permitted use.

The Zoning Commissioner, relying upon *Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 407 A.2d 738 (1979), held that "Baltimore County has the authority to reasonably regulate the exercise of a riparian right to erect an improvement upon tidal land attached to shore land through zoning." He concluded that zoning on land must extend into the water, for it was not the intent of the Baltimore County Council "to permit random development off shore as otherwise would not be allowed on dry land without being subject to regulations or laws." The Commissioner ordered that "those uses permitted on dry land located in [a] particular zone are permitted on tide water rivers, lakes, running streams, or land under water within lines extended from the zoning boundary lines of the dry land to which the 'wet' land is attached, from and after the date of this Order...."
The Commissioner's order was made contingent upon compliance with the Chesapeake Bay Critical Area legislation, Maryland Code (1988 Cum.Supp.), §§ 8–1801 *et seq.* of the National Resources Article, Title 14, subtitle 15 of the Code of Maryland Regulations (COMAR), and Bill Nos. 35–88 and

32–88 of the County Council of Baltimore County, Maryland (Development Regulations in the Chesapeake Bay Critical Area).

An appeal was taken to the Baltimore County Board of Appeals by the People's Counsel for Baltimore County. The Board stated that § 417 of the BCZR anticipates construction of improvements beyond the shoreline of tidal waters, and that the proposed restaurant was in compliance with that section. The Board held, however, that "no zoning is needed for the land beneath the water" as long as all other requirements (*e.g.* Baltimore County building regulations, permission from the United States Army Corps of Engineers, state and local Critical Area Regulations) were satisfied. It did not matter, according to the Board, whether "zoning lines on land extend [into] and comprehend ... land under water and improvements proposed or erected thereon."

On appeal to the Circuit Court for Baltimore County, People's Counsel argued that a zone must be placed upon land under water before development of a primary or non-water-dependent use is allowed. She argued that "because Baltimore County has not exercised its right to zone waterways, ... the direct effect thereof is that a use cannot be built into those unzoned waterways." The court (Turnbull, J.) affirmed the Board's order, declining to "substitute its judgment for that of an administrative agency." Citing *Harbor Island, supra,* it held that "the Counties have the power to regulate and restrict use of land including land under water." It noted that the proposed restaurant would be "surrounded by a pre-existing marina and [would extend] no further into the water way than the existing structures."

People's Counsel appealed. We granted certiorari before decision by the Court of Special Appeals to consider the significant issue raised in the case.

## II.

As we have frequently indicated, the order of an administrative agency must be upheld on judicial review if

it is not based on an error of law, and if the agency's conclusions reasonably may be based upon the facts proven. *Ad + Soil, Inc. v. County Comm'rs*, 307 Md. 307, 338–39, 513 A.2d 893 (1986). But a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law. *See, e.g., Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 835, 490 A.2d 1296 (1985); *Harford County v. McDonough*, 74 Md.App. 119, 122, 536 A.2d 724 (1988). The issues with which we are concerned in this case present purely legal questions, such as the proper interpretation of § 417 of the BCZR, the scope of a charter county's zoning power, and the extent of the riparian owner's right to construct improvements into the water.

People's Counsel argues before us that a specific zone must be placed on land under water before a non-water-dependent use may be developed. She contends that Baltimore County has not zoned the land under water at the boundary of Maryland Marine's property, and therefore the proposed restaurant cannot be constructed. Maryland Marine asserts that the proposed site is zoned B.L. Section 417 of the BCZR, it contends, "sets the guidelines for determining the types of improvements that may be constructed into the water" and also "provides the means for extending zoning lines on shore into tidal water." People's Counsel disagrees; she maintains that § 417.1 does not determine what types of improvements can be made, but rather lists general types of waterfront construction for illustrative purposes. People's Counsel also contends that § 417.3 does not extend zoning lines, but simply draws divisional lines to determine where waterfront construction may take place.

Considering the plain language of §§ 417.1 and 417.3, along with the illustrations in official Appendix J of the BCZR, we think it clear that the purpose of these sections is to determine divisional lines for waterfront construction as between two adjoining riparian property owners. Quite simply, these sections determine *where* waterfront struc-

tures may be placed, and do not purport to determine what *kinds* of waterfront structures may be built. Section 417.3 plainly states that it is "[f]or the purpose of defining boundaries within which waterfront construction may take place." It also discusses divisional and property lines, not zoning lines. Plainly, § 417.1 and § 417.3 were not enacted to regulate the kinds of riparian improvements which may be constructed. It is equally clear that § 417.3 does not extend or even address the placement of zoning boundary lines.

■ Both parties agree, in light of *Harbor Island, supra,* that Baltimore County has the power to zone land under water. Although *Harbor Island* involved a non-chartered county and its zoning authority under Maryland Code (1957, 1978 Repl.Vol.), Art. 66B, § 4.01, the parties agree that there is nothing in the zoning authority granted to charter counties like Baltimore County which would prevent them from exercising the same degree of zoning power as non-chartered counties.[2] But it is unnecessary to specifically decide this issue because even if Baltimore County has the power to zone land under water, it would not apply in this case. This is so because the scope of the County's zoning authority extends only as far as the scope of the right to construct riparian improvements.

In *Harbor Island,* we were asked to decide the extent to which a county may regulate, through zoning, the construction of riparian improvements.[3] We noted that a non-char-

---

2. *See* Maryland Code (1957, 1987 Repl.Vol.) Art. 25A, § 5(X) (The Express Powers Act—granting zoning power to charter counties). *Cf.* Art. 66B, § 4.01.

3. Riparian improvements are generally defined as those structures which are connected to waterfront land and built into the water. We have defined them as improvements which
    "a proprietor of land bounding on navigable waters, is entitled to make into the same.... [They] are plainly, we think, such structures as are subservient to the land, and which used in connection with the land, enhance its value or enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone

tered county's authority, under Art. 66B, § 4.01, to zone "land" was not limited to dry land, but included "any 'land' or 'lands' within its boundaries, . . . no matter whether wet or dry." 286 Md. at 313, 407 A.2d 738. We also observed that in Maryland "nearly all of the navigable waters, as well as the lands beneath them, are owned by the State for the benefit of all its citizens." *Id.* at 314, 407 A.2d 738.[4] Since State-owned lands are not subject to the county's zoning authority in the absence of a clear implication or a specific provision that the State is specifically bound by the zoning enabling act, we held that land under water is generally not subject to local zoning regulations. *Id.* at 315, 407 A.2d 738. *See also City of Baltimore v. State,* 281 Md. 217, 223, 378 A.2d 1326 (1977) (State is not bound by an enactment of the General Assembly unless the statute specifically names the State or manifests a clear and indisputable intention that it be bound). But our inquiry in *Harbor Island* was not thereby ended, for we also recognized that when permitted riparian improvements are com-

---

would be incapable of, and in this way 'improve' it. . . . Wharves, piers and landings are examples of such improvements."
*Hess v. Muir,* 65 Md. 586, 598, 5 A. 540 (1886).

4.    "The lands in Maryland covered by water were granted to the Lord Proprietor by Section 4 of the Charter from King Charles I to Caecillius Calvert, Baron of Baltimore, his heirs, successors and assigns, who had the power to dispose of such lands, subject to the public rights of fishing and navigation. . . . By virtue of Art. 5 of the Declaration of Rights in the Maryland Constitution, the inhabitants of Maryland became entitled to all property derived from and under the Charter and thereafter the State of Maryland had the same title to, and rights in, such lands under water as the Lord Proprietor had previously held. These lands were held for the benefit of the inhabitants of Maryland and this holding is of a general fiduciary character." *Kerpelman v. Bd. of Pub. Works,* 261 Md. 436, 445, 276 A.2d 56 (1971).

People's Counsel suggests that the public trust doctrine applies to this case and prohibits the construction of the proposed restaurant. She contends that since Maryland's submerged lands are owned by the State in trust for its citizens, it cannot allow these lands to be placed entirely out of its control, such as by a sale or by relinquishing its rights in the land to riparian owners. In view of our disposition of the case, we do not address this question.

pleted, they essentially become part of the dry land. Consequently, we said, the improvements become " 'incident to the estate, as not inherently identical in nature with land, but, from being joined to it, and contributing to its uses and value legally identified with it, as a fixture or a right of way, or other appurtenance that passes with the land.' " 286 Md. at 320, 407 A.2d 738 (quoting *Hess v. Muir,* 65 Md. 586, 598, 5 A. 540 (1886)). We therefore held that

> "when improvements are made into the navigable waters by a riparian proprietor, the land utilized in their construction, which prior to completion belonged to the State, for all practical purposes becomes a part of the fast land. Thus, any limitation upon the county's ability to zone which arises because the land in question belongs to the State does not apply to improvements attached to riparian land." 286 Md. at 322, 407 A.2d 738.

■ Under *Harbor Island,* therefore, a non-chartered county has the authority to reasonably regulate riparian improvements since State-owned submerged land, when covered by a permitted riparian improvement, takes on the characteristics of private land. It is essentially the same as though the riparian owner's lot had been extended to include this land; it then comes within the county's zoning authority.

■ Maryland Marine argues that the proposed restaurant is a riparian improvement which Baltimore County may regulate through zoning. Of course, all structures that may be built into the water cannot be classified as permissible riparian improvements. *Harbor Island* indicates that a county's power to zone extends only to those improvements which the riparian owner has a *right* to build into the water bounding its property, because it is only in relation to these improvements that the riparian has the right to the use of the submerged land upon which the improvement is constructed.

■ There are several rights which are enjoyed by the riparian owner. Not the least of these is the right to the flow of water by the riparian property in its natural state.

*Paper Company v. Zeitler,* 180 Md. 395, 397, 24 A.2d 788 (1942). The riparian proprietor also has a right to reasonable use of the water, subject to the same right of every other riparian owner, for legitimate domestic, agricultural and manufacturing purposes. *Id.; Kelly v. Nagle,* 150 Md. 125, 137–38, 132 A. 587 (1926).

At common law, the rights of riparian owners were generally limited to accretion and reliction.[5] In *B. & O. R.R. Co. v. Chase,* 43 Md. 23, 34–35 (1875), we noted that, at common law,

"[a]ny increase of soil formed by the gradual and imperceptible recession of the waters [reliction], or any gain by the gradual and imperceptible formation of what is called alluvion, from the action of the water in washing it against the fast land of the shore, and there becoming fixed as part of the land itself [accretion], shall belong to the proprietor of the adjacent or contiguous land."

The rationale behind this right, "the sole purpose of the rule, was to assure to the riparian owner that he would

---

**5.** There is some indication that the riparian owner's common law rights also included the right to "wharf out" for the purpose of access to navigable water. For example, in *B. & O. R.R. Co. v. Chase,* 43 Md. 23, 35 (1875), we noted that "in addition to this right by accretion or reliction, the riparian proprietor ... has the right of access to the navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier for his own use or for the use of the public.... These riparian rights, founded on the common law, are property, and are valuable...." In *Causey v. Gray,* 250 Md. 380, 387, 243 A.2d 575 (1968), we held that "[t]he owner of fast land ... has a common law right to land formed by accretion ... and has the right of access to the navigable part of the river in front of his fast land, with the right to make a landing, wharf or pier in front of his fast land...." There is also law to the contrary. *See, e.g., Melvin v. Schlessinger,* 138 Md. 337, 340, 113 A. 875 (1921) ("the riparian owner had no right whatsoever at common law to make improvements into the water in front of his land"); *Cahill v. Baltimore,* 173 Md. 450, 455, 196 A. 305 (1937) ("a right to build a wharf into deep water of such a navigable river as the Patapsco can be derived only from a grant or permission of the State"); *Goodsell v. Lawson,* 42 Md. 348, 362 (1875); *Wicks v. Howard,* 40 Md.App. 135, 136, 388 A.2d 1250 (1978) ("the right to extend permanent improvements into the waters in front of one's land is not an inherent or common law right").

never be cut off from his access to water." *Bd. of Pub. Works v. Larmar Corp.*, 262 Md. 24, 36, 277 A.2d 427 (1971). *See also Steinem v. Romney*, 233 Md. 16, 23, 194 A.2d 774 (1963) ("[the] fundamental riparian right—on which all others depend, and which often constitutes the principal value of land—[is] access to water"). We have noted that the right of access to the water is fundamental when "assessing the changes which have occurred in riparian rights down the corridor of years." *Id.* *See also Rayne v. Coulbourne*, 65 Md.App. 351, 500 A.2d 665 (1985).

█ We have held that the right to build a wharf or other structure into the water can be derived only from a grant or permission of the State, because virtually all land under water belongs to the State. *Potomac Sand & Gravel v. Governor*, 266 Md. 358, 364, 293 A.2d 241 (1972); *Cahill v. Baltimore*, 173 Md. 450, 455, 196 A. 305 (1937). The right to construct riparian improvements is also subject to revocation at any time before the improvement is actually completed. *Id.* at 457, 196 A. 305. In *West. Md. T.R. Co. v. Baltimore City*, 106 Md. 561, 68 A. 6 (1907), we stated:

"It should not be forgotten that although the riparian owner has a right to ... make improvements into the water in front of his original land, yet until he does so, the title to the land under the water is in the State.... '[T]he right to make improvements in navigable waters ... [is] a mere privilege ... and ... until the improvement [is] completed, no title [is] acquired by the adjacent owner.'" *Id.* at 567, 68 A. 6 (*quoting Linthicum v. Coan*, 64 Md. 439, 453, 2 A. 826 (1886).

*See also Bd. of Public Works v. Larmar Corp.*, 262 Md. 24, 50, 277 A.2d 427 (1971) ("Indeed, it would appear that a valid distinction may be drawn between 'used' and 'unused' riparian rights and ... that constitutional protection ... may extend only to such rights as the riparian actually exercises before the Legislature decides to make changes or modification."); *City of Baltimore v. Canton Co.*, 186 Md. 618, 625, 47 A.2d 775 (1946) ("the riparian owner [has] no vested title to the land covered by water, ... nor to the

improvements built out of the water, until the improvements [have] been actually completed"). *Accord, Culley v. Hollis,* 180 Md. 372, 376, 25 A.2d 196 (1941); *Cahill v. Baltimore, supra,* 173 Md. at 456, 196 A. 305; *Hodson v. Nelson,* 122 Md. 330, 338, 89 A. 934 (1914); *Wicks v. Howard, supra,* 40 Md.App. at 137, 388 A.2d 1250. We also noted in *Hodson, supra,* that only when riparian improvements are made, "and [only] to the extent actually occupied by the improvements, do [they] and the ground they necessarily occupy become 'incident to the estate.'" 122 Md. at 340, 89 A. 934.

In Maryland, the right to construct riparian improvements has been largely controlled by statute.[6] In 1745, an Act which incorporated Baltimore Town provided that within the town

"[a]ll Improvements, of what kind soever, either Wharfs, Houses, or other Buildings, that have or shall be made out of the Water, or where it usually flows, shall (as an Encouragement to such Improvers) be for ever deemed the Right, Title and Inheritance of such Improvers, their Heirs and Assigns for ever." Ch. 69, § 10 of the Acts of 1745.

The apparent purpose of this statute was to encourage the growth of the town by expansion of its port. *Harbor Island, supra,* 286 Md. at 316, 407 A.2d 738. In order to encourage the efficient use of land near and under water, the Lord Proprietor agreed to relinquish all rights of ownership in the submerged lands covered by the improvements. *Id.* In *Larmar, supra,* we observed that the 1745 Act

---

6.  "In defining the exact limits of the rights of the riparian proprietor at the common law ..., there is to be found a considerable diversity of opinion among courts of high authority, as well as among the writers upon the subject. In this State, however, those rights have been defined by statute, and secured to the proprietor to an extent beyond what the common law allowed, even according to the largest definition of those rights under that law."
*Garitee v. Baltimore,* 53 Md. 422, 432 (1880).

"was obviously passed to accommodate the growing pains of a burgeoning colony as a prelude to the state and nation to be. Environmental factors and ecological balances were not yet the concern of the people of this new land. Their concern was the building of a bustling port on the eastern seaboard to support westward expansion of population and commerce." 262 Md. at 37, 277 A.2d 427.

The Act of 1745 applied only to Baltimore Town. There was no clear statutory definition of the rights of riparian owners in other parts of the State to construct improvements until 1862, when the Maryland General Assembly enacted ch. 129 of the Acts of 1862, later codified as Maryland Code (1957), Art. 54, § 45, *et seq.* That statute provided in part (§ 46):

"the proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made."

It seems clear that both the 1745 and the 1862 Acts were meant to confer a right to construct improvements for purposes beyond mere access to the navigable portion of the water. As earlier indicated in *Hess v. Muir, supra,* we defined these improvements as

"such structures as are subservient to the land, and which used in connection with the land, enhance its value or enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone would be incapable of, and in this way 'improve' it.... Wharves, piers and landings are examples of such improvements." 65 Md. at 598, 6 A. 673.

We noted that "[f]arming and commercial interests are promoted by the privilege and to encourage the development of these was the main object of conferring it." *Id.*

In 1970, the General Assembly repealed Art. 54, § 46, and adopted the Wetlands Act, Maryland Code, (1973, 1983 Repl.Vol.) § 9–101 *et seq.* of the Natural Resources Article. Section 9–201 of that act, in accordance with its objective of preserving the State's wetlands, provides for a more limited right to construct riparian improvements. It specifies that "[a] person who is the owner of land bounding on navigable water ... may make improvements into the water in front of the land *to preserve that person's access to the navigable water* or *protect the shore of that person against erosion.* After an improvement is constructed, it is the property of the owner of the land to which it is attached." (Emphasis added.)[7] A 1972 Attorney General's Opinion concluded that

> "[t]he unequivocal intent of the [Wetlands] Act is to limit the rights, privileges and enjoyment of riparian ownership.... [T]he improvements contemplated within the wetlands law connote a more restrictive use of that term than in former Section 46 of Article 54 since the word 'improvements' is limited and defined now as 'for the purpose of preserving .... access to navigable water or for protecting .. shore against erosion.'" 57 Op. Att'y Gen. 445, 455 (1972).

---

7. We have, on other occasions, recognized that the Wetlands Act confers a more restrictive right to construct riparian improvements. For example, in *Owen v. Hubbard,* 260 Md. 146, 161, 271 A.2d 672 (1970), we stated that "the new wetlands act ... has repealed and ... replaced Art. 54, Sec. 46 with a more limited right to construct shoreline improvements." In *Harbor Island, supra,* we took note of the possibility that the Wetlands Act imposed additional restrictions on the right to construct riparian improvements, but found it unnecessary to reach the issue in that case. 286 Md. at 323, n. 13, 407 A.2d 738. It is manifest that consideration must be given to the need for a permit from the State Board of Public Works before constructing the riparian improvements authorized by the Wetlands Act. *See also Hirsch v. Md. Dep't of Nat. Resources,* 288 Md. 95, 100, 416 A.2d 10 (1980) (discussing the riparian provisions of the Wetlands Act).

*See also* Comment, *Maryland's Wetlands: The Legal Quaqmire,* 30 Md.L.Rev. 240, 254 (1970) ("The improvement section of the 1862 Act has also been narrowed significantly; the new statute only provides *specifically* for improvements for the purpose of preserving the riparian's access to the water or for protecting his shore against erosion.").

### III.

It is clear that Maryland Marine's right to build improvements into the waters of Frog Mortar Creek is subject to the provisions of § 9–201 of the Wetlands Act. That construction of the proposed restaurant would not, within the contemplation of § 9–201, constitute an improvement to preserve access to navigable water or to protect the shore against erosion is, of course, equally clear. Thus, even though Baltimore County may have authority to zone permitted riparian improvements, it is not presently empowered to permit construction of the restaurant in this case. Nevertheless, in furtherance of its plan, Maryland Marine may seek to acquire, by purchase or lease from the State Board of Public Works, that part of the State's submerged land upon which the restaurant is planned to be erected. Section 9–201 of the Wetlands Act provides that "[a] right covered in this subtitle does not preclude the [riparian] owner from developing any other use approved by the Board [of Public Works]." And Maryland Code (1985, 1988 Repl.Vol.), § 10–402 of the State Finance and Procurement Act allows for the conveyance of State-owned submerged land to a riparian owner under certain circumstances and under certain conditions. Section 10–305 also generally provides for the lease of State-owned land to private persons. We also note that, along with other requirements, State and Baltimore County Critical Area Regulations must be satisfied before the proposed project may be permitted to proceed.[8]

---

**8.** *See* Maryland Code (1973, 1988 Cum.Supp.) § 8–1801 *et seq.* of the Natural Resources Article; Code of Maryland Regulations (COMAR)

We therefore conclude, for the purposes of this case, that Baltimore County is not empowered to provide the required initial authorization for the construction of the proposed non-riparian restaurant use.[9]

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE MATTER TO THE BOARD OF APPEALS OF BALTIMORE COUNTY WITH INSTRUCTIONS TO VACATE ITS ORDER AND THAT OF THE ZONING COMMISSIONER OF BALTIMORE COUNTY AND TO ENTER AN ORDER CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.

---

Title 14, subtitle 15; and Bill No. 35–88 of the County Council of Baltimore County, Maryland (Development Regulations in the Chesapeake Bay Critical Area). The Critical Area Program was adopted by the General Assembly in 1984 to establish programs on a cooperative basis between the State and local governments to encourage "more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats." § 8–1801(b)(1) of the Natural Resources Article.

9. Section 103.2 of the BCZR provides that "[w]hen any public use ceases or when title of unzoned public land passes into private ownership, [it] shall not be used for private purposes until ... zoned in accordance with these Regulations." Thus, should the State Board of Public Works permit Maryland Marine to acquire title to the site, § 103.2 may permit zoning of the site by Baltimore County since title to the formerly unzoned land would pass unto private ownership.